**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PAMELA S. NICHOLS, | ) | CASE NO. 1:23-CV-02063 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE REUBEN |
| | ) | SHEPERD |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER REJECTING REPORT AND** |
| Defendant. | ) | **RECOMMENDATION AND** |
| | ) | **REMANDING FOR FURTHER** |
| | ) | **PROCEEDINGS** |

On October 20, 2023, Plaintiff Pamela Nichols filed a Complaint seeking judicial review of Defendant Commissioner of Social Security's decision to deny her application for disability insurance benefits and supplemental security income.  (ECF No. 1).  On June 21, 2024, Magistrate Judge Reuben Sheperd issued a Report and Recommendation ("R&R") recommending that the Court vacate the Commissioner's decision denying Petitioner's application and remand for additional proceedings consistent with the R&R.  (ECF No. 12).

Fed. R. Civ. P. 72(b)(2) provides that the parties may object to an R&R within 14 days after service.  Under the Federal Magistrates Act, a district court must review *de novo* those portions of the R&R to which the parties have objected.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). Absent objection, a district court may adopt an R&R without further review.  *Thomas v. Arn*, 474 U.S. 140, 149 (1985).  The Commissioner objected to the R&R on July 3, 2024.  (ECF No. 13). Plaintiff responded.  (ECF No. 14).  For the following reasons, the Court **REJECTS** the R&R, **AFFIRMS** the decision of the ALJ in part, and **REMANDS** to Magistrate Judge Sheperd for further proceedings consistent with this Order.

1

## I.    FACTUAL BACKGROUND

### A.  Plaintiff's Appeal

Plaintiff appealed Administrate Law Judge Catherine Ma's ("ALJ") determination that Plaintiff could work despite her chronic problems related to her left ankle.  Plaintiff brought the following two issues to the Court for review:

1.  Whether the [ALJ] erred in finding Ms. Nichols could perform other work where the [ALJ] erred in her evaluation of treating physician opinion that Ms. Nichols needs to elevate her leg during the workday, in part because the [ALJ] misread the opinion and ignored the evidence that supported that opinion?

2.  Whether the [ALJ] erred in her evaluation of pain and other symptoms where she overstated Ms. Nichols's activities and failed to build a logical bridge between the evidence and the ultimate conclusions concerning residual functional capacity?"

(ECF No. 9, Pltf. Merits Br., PageID #2306).  The R&R is based on question one only and did not address the merits of question two.  (*See* ECF No. 12, PageID #2390).

### B.  Plaintiff's Disabilities

Plaintiff first sought a finding of disability based on "lupus, malformation of left ankle, increased swelling of left ankle, vertigo, depression, inactive tuberculosis, asthma, difficulty walking, PCOS[1] and learning disability." (Tr. 128).  The ALJ found that Plaintiff has the following severe impairments: "gouty arthritis, rheumatoid arthritis left foot unspecified, arthralgia left ankle, sciatica, posterior tibial tendon dysfunction, obesity, unspecified depressive disorder, anxiety, and borderline intellectual functioning." (Tr. 1361).  The ALJ also found that Plaintiff has the following non-severe impairments: "blood-clotting disorder/polycythemia, inactive TB[2], low blood potassium, PCOS, plantar fasciitis, dermatitis, asthma, hyperlipidemia, hypertension, vitamin D deficiency, migraine headaches, and sinus tachycardia." (*Id.*).  Of these listed

---

[1] "PCOS" stands for Polycystic Ovary Syndrome.  *Polycystic Ovary Syndrome (PCOS)*, Cleveland Clinic, https://perma.cc/2LLL-23FL.
[2] "TB" stands for Tuberculosis.  *Tuberculosis*, Cleveland Clinic, https://perma.cc/R97S-WZ3H.

disabilities, the only ones relevant to Plaintiff's appeal relate to the swelling and pain in her left ankle.  (ECF No. 9, PageID #2306; ECF No. 12, PageID #2384).

### C.  Relevant Medical History

#### 1.  Plaintiff's ankle gets worse: February 21, 2018 to April 26, 2021

Plaintiff began seeking treatment for her left ankle from Dr. Jurek on February 21, 2018.  (Tr. 667).  At the time, she was working full time as a laundry worker for Grace Management.  (Tr. 1406).  Dr. Jurek observed a warm, tender mass on the side of her left ankle.  (Tr. 668).  Her gait was otherwise normal.  (*Id.*).  She was diagnosed with acute left ankle pain (uric acid).  (*Id.*).  When she returned for a follow up, her ankle was tender along the lateral ligaments and near the plantar fascia in her heal, without erythema or swelling.  (Tr. 666).  She could bear weight on the ankle, but complained that her ankle gets swollen after being on her feet all day.  (Tr. 665).  She was diagnosed with gouty arthritis, given a prescription for 800 mg ibuprofen, and referred to physical therapy.  (*Id.*).

Plaintiff attended physical therapy nine times throughout April and May of 2018.  (Tr. 643–65).  The physical therapist noted Plaintiff's left ankle pain, decreased left ankle range of motion, decreased lower extremity strength, and difficulty walking.  (*Id*).  She recommended that Plaintiff elevate and ice her ankle "as much as possible to decrease edema."[3]  (Tr. 650).  Plaintiff stopped physical therapy voluntarily because she lost her health insurance, claiming she felt 60% functional with continued limited left ankle range of motion and intermittent pain with prolonged activities.  (Tr. 643).  She was sent home with an exercise plan to continue post-discharge.  (*Id.*).

Plaintiff alleges a date of disability of December 20, 2018.  (ECF No. 33, PageID 2367).  Nine months after her last physical therapy session and one year after her last appointment, she

---

[3] Edema, also known as swelling, is a medical term for the buildup of fluid in the body's tissues, often appearing as puffiness or swelling, especially in the legs, ankles, and feet.

returned to Dr. Jurek on February 22, 2019, again complaining of ankle swelling and difficulty walking.  (Tr. 639).  Plaintiff was referred to a podiatrist, Coleen Debarr, who noted (on March 6, 2019) tenderness and deformity in the left foot, decreased arch height upon weight bearing, collapse of the medial longitudinal arch, decreased range of motion, pain with palpitation, and too many toe sign.  (Tr. 765).  Plaintiff's gait showed flexible deformity pronation through the gait cycle.  (*Id.*).  An x-ray showed no evidence of fracture, but a small heel spur and possible soft tissue swelling in the calf and ankle.  (*Id.*).  Plaintiff received antibiotics, custom orthotics, ankle straps, stretching exercises, and a recommendation to wear compression stockings daily.  (Tr. 766).

Plaintiff returned to Dr. Jurek on March 18, 2019.  (Tr. 1296).  She said the antibiotics did not help and the left ankle swelling remained.  (Tr. 1296; 1301).  Plaintiff had edema and tenderness in her left ankle, this time with normal range of motion.  (Tr. 1304).  She was ANA positive,[4] referred to rheumatology, and prescribed a handicap placard and 4-prong cane.  (*Id.*).  Plaintiff met with rheumatologist Susan Mathai on April 3, 2019, still complaining of pain and swelling that worsened with activity.  (Tr. 926).  She had a normal gait and station, but had diffuse swelling and pain in her left ankle in all range of motion.  (Tr. 929).  Dr. Mathai prescribed steroids for suspected inflammatory arthritis.  (Tr. 930).

Plaintiff went to the emergency room on April 13, 2019, with left lower extremity pain, swelling, and rash.  (Tr. 959).  She had edema and blanchable erythema scattered around her calf.  (Tr. 961).  She received prescriptions and an order to follow up with her primary care provider ("PCP").  (Tr. 959).  Her records do not show that she followed up with her PCP.  Dr. Spindler performed a psychological evaluation of Plaintiff on April 25, 2019, during which she reported an

---

[4]  "ANA positive" refers to the Antinuclear Antibody Test.  A large number of antinuclear antibodies in a person's blood "may be a sign of an autoimmune disorder."  *ANA (Antinuclear Antibody) Test*, MedlinePlus.gov, https://perma.cc/7SJD-ZHJX.

inability to work because her left ankle swells and she cannot stand on it.  (Tr. 396, 398).  At that point, she reduced her hours to 14 per week.  (Tr. 399).  She reported that she could, however, take care of her dog, wash dishes, vacuum, and do her own laundry.  (*Id.*).  Dr. Spindler observed that Plaintiff's gait seemed to favor her left side.  (Tr. 398).

At a rheumatology follow up on May 7, 2019, Plaintiff reported that she completed a course of antibiotics and her symptoms improved; her prescribed insoles and ibuprofen provided some relief, but her left ankle swelling and pain continued after working or if she stood too long.  (Tr. 982).  Her left ankle was swollen, but her gait was normal.  (Tr. 984).  She received an ultrasound of her ankle.  (Tr. 987).  At a June 12, 2019 follow up with Dr. Mathai, the ultrasound showed mild to moderate left tibiotalar synovitis and subcutaneous edema around the left ankle.  (Tr. 995).  Plaintiff's gait was normal.  (Tr. 997).  Dr. Mathai observed that steroids and the ankle boot did not help, physical therapy helped temporarily, and ibuprofen and Voltaren provide relief; she prescribed Plaquenil.  (Tr. 995; 998).

Plaintiff followed up with Dr. Debarr on August 1, 2019, reporting that her orthotics were too painful to wear.  She said she continued to take ibuprofen and wear the ankle strapping with some relief.  (Tr. 1003).  Dr. Debarr's examination of Plaintiff was the same, including decreased range of motion and gait deformity.  (Tr. 1004).  In addition to reminding Plaintiff to wear the orthotics, she recommended that Plaintiff "rest and elevate daily."  (*Id.*).

Plaintiff saw endocrinologist Rami Alrezk on September 5, 2019.  (Tr. 1008).  Dr. Arezk saw lower extremity edema and recommended that Plaintiff exercise three times per week to help with obesity; when Plaintiff complained that she could not exercise due to ankle pain, Dr. Arezk recommended pool exercises.  (Tr. 1012). At a follow up on October 16, 2019, Dr. Arezk again observed edema along with Plaintiff's normal gait.  (Tr. 1045).

Plaintiff saw Dr. Mathai again on October 9, 2019, still complaining of left ankle pain and swelling that increases as the day progresses.  (Tr. 1028).  Plaintiff had normal gait and station with diffuse swelling and pain on range of motion in her left ankle.  (Tr. 1033).  Dr. Mathai referred Plaintiff to orthopedics and vascular.  (*Id.*).  Plaintiff met with orthopedist Alan Davis on October 28, 2019, who observed Plaintiff's left-favoring gait.  (Tr. 1060).  An MRI showed that Plaintiff likely had inflammatory arthritis.  (Tr. 1064).  At a November 11, 2019 follow up, Plaintiff claimed that the ibuprofen was no longer working and that she did not like using her cane.  (Tr. 1067).  Dr. Davis diagnosed Plaintiff with left foot pain, flat feet, and rheumatoid arthritis involving the left foot with unspecific rheumatoid factor presence.  (Tr. 1070).  He fitted Plaintiff with a more comprehensive ankle brace and gave her a cortisone injection in her left ankle.  (*Id.*).

Plaintiff followed up with Dr. Davis on February 26, 2020, and told him that the cortisone injection provided around three weeks of relief.  (Tr. 1183).  Plaintiff's ankle continued to swell with intermittent sharp pain, but the ibuprofen was helping.  (*Id.*).  Dr. Davis observed a left-leaning gait, swelling, and limited range of motion.  He discussed further injections.  On February 28, 2020, Plaintiff met with Dr. Bartholomew, a vascular specialist.  (Tr. 1187).  He observed swelling in Plaintiff's left ankle consistent with lipedema; he recommended custom-fit below-the-knee support hose.  (*Id.*).  Not included in the R&R is Plaintiff's explanation that her swelling is better in the morning and gets worse as the day progresses.  (Tr. 1187).  She also answered "No" to "Are you having pain associated with your visit today?"  (Tr. 1191).

Plaintiff's last day of work was Sunday, April 12, 2020.  (Tr. 1404–05).  She testified that she was terminated because she could not work if she could not get vaccinated against Covid-19; Plaintiff could not get vaccinated due to the medications she was taking.  (Tr. 1405).

Plaintiff followed up with Dr. Mathai on June 29, 2020. (Tr. 2117). Dr. Mathai started Plaintiff on methotrexate. (Tr. 2123). Around 10 months later, on April 7, 2021, Plaintiff saw Dr. Mathai and reported that her pain had somewhat improved, though pain and swelling persisted. In an effort to start a new medication, Enbrel, Dr. Mathai required Plaintiff to undergo an infectious disease screening. (Tr. 1998; 2004). Plaintiff was positive for latent tuberculosis. (*Id.*). Plaintiff saw primary care provider Meaghan Beal, CNP on April 26, 2021; Beal noted Plaintiff's lymphedema for which she elevated her legs and wore compression stockings.

2. Plaintiff's ankle gets better: September 16, 2021 to November 17, 2022

Plaintiff saw Dr. Mathai again on September 16, 2021. (Tr. 1958). Plaintiff ambulated well with mild pain and swelling. (*Id.*). Plaintiff stated that she was doing much better. (Tr. 1959). Not included in the R&R is Plaintiff's October 6, 2021 office visit with Meagan Parker, APRN.CNP to follow up on her blood pressure. (Tr. 1677–89). Parker's notes indicate that Plaintiff did not exhibit any gait problems during her visit and exhibited a normal range of motion throughout her musculoskeletal system. (Tr. 1688).

Plaintiff returned to Dr. Mathai on January 6, 2022, complaining of numbness and tingling in her hands; Dr. Mathai suspected carpal tunnel, but the EMG did not show such condition. (Tr. 1916–29). Not included in the R&R is Plaintiff's follow-up visit with Parker on March 7, 2022. (Tr. 1659–72). Plaintiff informed Parker that she wanted a Tdap vaccine because she was "***going to be watching her nephew as soon as he is born***." (Tr. 1671) (emphasis added). Plaintiff again exhibited a normal range of motion. (*Id.*).

Plaintiff saw Dr. Mathai again on March 17, 2022. (Tr. 1904). Dr. Mathai again observed that Plaintiff ambulated well and had mild pain and swelling in her left ankle. (*Id.*). She continued Plaintiff on Enbrel. (Tr. 1905). Not included in the R&R is Plaintiff's April 21, 2022 follow up

visit with Parker.  (Tr. 1631–47).  Parker again observed Plaintiff's normal gait and range of motion.  (Tr. 1645).

Also not included in the R&R is Plaintiff's June 9, 2022 visit with Melissa Holtz, APRN.CPN (a dermatologist).  (Tr. 1610–27).  Plaintiff answered a questionnaire in which she answered "Moderately" to "To what extent are you able to carry out your everyday physical activities such as walking, climbing stairs, carrying groceries, or moving a chair?" (Tr. 1622).  She also described her physical health as "Good."  (*Id.*).

Plaintiff saw Dr. Mathai again on November 17, 2022.  (Tr. 2233).  Plaintiff had two arthritic flare ups since her last visit that improved with steroids.  She had pain in both ankles; Dr. Mathai observed that Plaintiff ambulated well with mild pain and swelling in her left ankle. Plaintiff stopped taking Enbrel because she did not like injecting it; Dr. Mathai continued methotrexate.  (Tr. 2233; 2237).

### D.  State Agency Reviewers

Dr. Mehr Siddiqui, M.D. reviewed Plaintiff's medical record on April 10, 2019.  (Tr 66–80).  Dr. Siddiqui observed that Plaintiff was working at the time, though that fact was not dispositive of his disability determination.  (Tr. 67).  Based on the records obtained from Dr. Spindler, Dr. Siddiqui opined that Plaintiff had the mental ability to manage funds, but may "have a problem understanding, remembering and carrying out instructions in some job settings.  She seems capable of managing a variety of unskilled, labor type jobs." (Tr. 68).  Dr. Siddiqui also observed that Plaintiff could sustain a working pace and level of attention and concentration that would be adequate in most job settings, and that she could handle routine work pressures.  (*Id.*).

Dr. Siddiqui found that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were unsubstantiated by the objective medical

evidence.  (Tr. 74).  In particular, Plaintiff's claim that she has difficulty walking due to ankle pain

was contradicted by her normal gait and x-rays.  (*Id.*).  Dr. Siddiqui opined that Plaintiff could sit,

stand, and/or walk for a total of six hours in an eight-hour workday.  (Tr. 75).  He also limited

Plaintiff's work activities to avoid climbing ladders, ropes, and scaffolding and exposure to

hazards including heavy machinery, commercial driving, and unprotected heights.  (Tr. 75–76).

Concluding that Plaintiff is not disabled, Dr. Siddiqui stated:

> You said you were disabled due to lupus, malformation of left ankle,
> increased swelling of left ankle, vertigo, depression, inactive tuberculosis,
> asthma, difficulty walking, PCOS and learning disability.  The medical
> evidence in file shows you are able to walk, lift and carry enough to
> complete a normal workday.  Although you are depressed at times, you have
> some ability to concentrate, remember and interact with others.  We do not
> have sufficient vocational information to determine whether you can
> perform any of your past relevant work.  However, based on the evidence
> in file, we have determined that you can adjust to other work.

(Tr. 80).  Following a consultative exam, Paul Tangeman, Ph.D. reported on May 10, 2019, that

Plaintiff's ability to understand and remember details is limited to completing one- to two-step

tasks without the demand for production and pace quotas but noted no other mental limitations.

(Tr. 77–78).  The same day, Disability Adjudicator/Examiner Robin Matthews signed a note

indicating that Dr. Susan Mathai, M.D. mailed records of Plaintiff's April 3, 2019 visit to the state

agency for review.[5]  (Tr. 71).  Matthews signed the full report, containing both Dr. Siddiqui's and

Dr. Tangeman's disability determinations, on May 10, 2019.  (Tr. 80).

On reconsideration, Dr. Gerald Klyop, M.D. reviewed Plaintiff's medical information.  (Tr.

114–29).  Plaintiff claimed that the swelling and pain in her ankle worsened in May 2019.  (Tr.

---

[5] As for the April 3, 2019 visit with Dr. Mathai, the R&R explains: "On April 3, 2019, Nichols met with rheumatologist Susan Mathai, M.D. and complained of constant pain and swelling, worsened with activity.  (Tr. 926).  On examination, she had normal gait and station; most joints were normal, without pain, swelling, tenderness, deformity, and had full range of motion. (Tr. 929).  However, her left ankle had diffuse swelling and pain on all range of motion. (*Id.*).  Dr. Mathai noted the left ankle pain with positive ANA, elevated sedimentation rate, and malar rash were suspicious for inflammatory arthritis.  (Tr. 930).  She recommended considering a trial of steroids after completing imaging."  (ECF No. 12, PageID #2370–71).

115).   She reported developing inflammatory arthritis on June 12, 2019.   (*Id.*).   Plaintiff also reported working since her last disability report.   (*Id.*).   Dr. Klyop reviewed the records from Dr. Spindler and opined (similar to Dr. Siddiqui) that Plaintiff had the mental ability to manage funds, could manage a variety of unskilled labor positions, sustain a working pace and level of attention and concentration that would be adequate in most job settings, and handle routine work pressures. (Tr. 117).

During a phone interview with Dr. Klyop, Plaintiff said that she had a "hard time walking at times" and required a cane or wheelchair depending on the distance.   (Tr. 120).   Dr. Klyop observed that Plaintiff's medical records do not bear out that statement; "She has a normal gait and her X-rays are negative."  (Tr. 122).   On September 13, 2019, Dr. Jennifer Swain, Psy.D. performed the mental health portion of Plaintiff's evaluation and made findings similar to those of Dr. Tangeman.   (Tr. 125–26).   On September 18, 2019, Dr. Klyop concluded that Plaintiff is not disabled:

> You said you were disabled due to lupus, malformation of left ankle, increased swelling of left ankle, vertigo, depression, inactive tuberculosis, asthma, difficulty walking, PCOS and learning disability.   Your condition results in some limitations in your ability to perform work related activities. We have determined that your condition is not severe enough to keep you from working.   We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(Tr. 128).

### E.  Treating Medical Providers

On July 19, 2021, Dr. Mathai authored a letter stating *in toto*: "Patient named above is under my care for Rheumatoid Arthritis.   She is not able to work at this time due to joint pain and swelling.   Please call me with any questions or clarifications."   (Tr. 1967).   Dr. Mathia authored a

second, identical letter on July 19, 2021.  (Tr. 2012).  In her January 30, 2023 Medical Source Statement, Dr. Mathai answered four questions about Plaintiff's need to elevate her leg.  (Tr. 2239). She stated that Plaintiff needs to elevate her legs for one hour during an eight-hour workday.  (*Id.*). According to the treatment notes attached to this statement from Plaintiff's last visit with Dr. Mathai (dated November 17, 2022), Plaintiff had left ankle swelling with mild pain, but ambulated well.  (Tr. 2244).

## II.  PROCEDINGS BEFORE THE ADMINISTRATIVE LAW JUDGE

### A. Administrative Hearing Evidence

#### 1.  Plaintiff's Testimony

The hearing on Plaintiffs claim was held on February 9, 2023.  (Tr. 1397–429).  Plaintiff testified, as well as Diane Neyhouse, a vocational expert.  (*Id.*).  Plaintiff's counsel gave a brief opening statement, summarizing (1) Dr. Mathai's January 30, 2023 recommendation that Plaintiff elevate her leg at least one hour per day; (2) Dr. Debarr's recommendation [between March 6, 2019 and August 1, 2019] that Plaintiff elevate her leg daily; and (3) the physical therapist's recommendation [between April and May of 2018] that Plaintiff elevate her leg and ice as much as possible.  (Tr. 1402–03).

As plaintiff testified, she lives with her father, who works from 5:30 AM to 2:30 PM.  (Tr. 1403).  She is a high school graduate, she drives, and she is unemployed.  (Tr. 1404).  She receives welfare and food stamps.  (*Id.*).  She testified that she was let go from her job on Easter at the start of the pandemic due to her inability to be vaccinated against COVID-19, though she thought that was in 2019 rather than 2020.  (Tr. 1404–05; 1408–09).[6]  Plaintiff has since been vaccinated.  (Tr.

---

[6] Her attorney told the Court that Plaintiff had been a laundry worker with Grace Management; the ALJ noted that before that, Plaintiff had been a cashier at Speedway.  (Tr. 1406–07).  Her role as laundry worker included a light exertion level.  (Tr. 1408).

1409).  Plaintiff testified that she had not returned to work because of "difficulty walking and standing for long periods of time.  And even sitting is difficult now.  The swelling still happens when I'm sitting."  (*Id.*).

Plaintiff testified that she takes medications, rests, elevates her leg above her heart while lying flat, ices her ankle, wears compression stockings and an orthopedic boot, and uses a cane daily or a wheelchair for long distances to deal with her ankle swelling.  (Tr. 1410).  She also uses an electric scooter at stores that provide them.  (*Id.*).  She testified that methotrexate, resting, elevating her leg, and ibuprofen help manage her pain and swelling.  (*Id.*).

Plaintiff has difficulty showering and engaging in other hygiene tasks.  (Tr. 1412).  However, she does her own shopping, cooks her own meals, does her own laundry, and does chores around the house.  (Tr. 1413).  She says that these things take her a long time to do.  (*Id.*).  She also provides all of the care for her dog, including taking him outside to the front lawn to relieve himself.  (Tr. 1414).  She described a typical day as follows:

> I get up probably about 9:00—get up, go to the bathroom, take the dog out, make breakfast for me, make sure [the dog has] got everything he needs, lay down, elevate.  And then I basically get up, make a small snack for myself and then elevate some more.  And then I go and make lunch, take him out again, come back in, elevate.  And I basically just elevate—I basically lay down and wait for my dad to get home from work.

(Tr. 1414–15).  After her dad makes dinner and they eat, she will sometimes go to the grocery store, either alone or with her dad.  (Tr. 1415).

Regarding her other activities, she testified that, during the winter months, she does not go out to eat or take trips to stores as often, nor visit museums as often.  (*Id.*).  When she does, she takes her wheelchair.  (*Id.*).  In the summer months, her dad gets her a season pass to Cedar Point where she drives an electric scooter to watch the shows, the people, and get fresh air.  (Tr. 1415–16).  She also goes to the auto shows and looks at the cars on display.  (Tr. 1416).  At home, she

testified that she does nothing—she does not watch TV, use electronic devices, or engage in any hobbies; she closes her eyes and tries to rest.  (Tr. 1416–17).

Upon questioning by her attorney, Plaintiff testified that her driving is limited because her legs sometimes stiffen so much that her foot gets stuck on the pedal.  (Tr. 1418).  She drives short distances "when [she's] not hurting," and otherwise has family members drive her.  (*Id.*).  Before she stopped working at Grace Management, she had reduced her hours to 15 to 20 per week for about six months before she left; she did this to limit her leg swelling.  (Tr. 1419).  She claims that she spends about 75% of everyday elevating and icing her legs and hiking up her compression socks.  (*Id.*).  Regarding her trips to Cedar Point, Plaintiff testified that she manages her swelling as follows:

> We take a break every so often, and I sit on a bench or, like, sit on the bench and lay my feet on the back of the bench, like I'm looking at the world upside down.  Because I keep my compression socks on while I'm at the park and 90% of the time now, except for when I'm sleeping.  So obviously, I stop and I sit down, rest, make sure I drink plenty of water.

(Tr. 1420).  She also testified that she is currently 288 pounds; she has been approved for gastric bypass, but is having difficulty losing the first 50 pounds on her own as required before the procedure.  (Tr. 1420–21).

### 2.  Vocational Expert's Testimony

After Ms. Neyhouse was sworn in, the ALJ and Plaintiff's attorney discussed Plaintiff's earnings since December 2018; the ALJ noted significant earnings in 2019 and 2020.  (Tr. 1422).  Plaintiff's counsel informed the ALJ that Plaintiff worked only 15 hours per week for all of 2019; this is inconsistent with Plaintiff's testimony that she reduced her hours to 15-20 per week for the six months preceding her termination.  (*Compare* Tr. 1423 *with* Tr. 1419).

13

The ALJ asked Ms. Neyhouse about a hypothetical person with Plaintiff's restricted activities and the work such person could perform.  (Tr. 1424).  Ms. Neyhouse testified that she could not return to her past work, but "could do the job of a merchandise marker, 209.587-034, SVP[7] of 2, estimated jobs in the national economy 137,000, the job of a routing clerk, 222.687-022, SVP 2, estimated jobs in the national economy 118,000, and the job of an officer helper, 239.587-010, SVP 2, estimated jobs in the national economy 6,700."  (*Id.*).

Upon questioning by Plaintiff's counsel, Ms. Neyhouse confirmed that each job was SVP 2, which is considered unskilled work.  (Tr. 1425).  The reasoning level of each position is also a 2, which is the reasoning skills associate with a fourth- to sixth-grade education.  (Tr. 1425–26).  With regard to leg elevation, Ms. Neyhouse testified:

> Q.  Okay.  Thank you.  If the individual needed to elevate one's leg above heart level at any time during the workday, would that be work-preclusive?
>
> A.  Most likely.  First of all, it's not discussed in the DOT,[8] as far as elevating your leg.  Second of all, it would be up to an employer to make that an appropriate accommodation for somebody to be able to accommodate their leg, if it was outside the standard breaks, which are two 15-minute breaks, a 30-minute lunch, and occasional bathroom breaks.
>
> Q.  Okay.  So in your view, is—are the breaks used—is the intention of breaks provided in the workplace for the person to be able to go to the bathroom and also to eat meals or snacks?
>
> A.  Usually, that sort of break is used for—to sit down, and if they needed to raise their legs during a break period, I am—excuse me—based on my professional opinion, an employer would be able to make in most cases, but I can't promise you that.  But in most cases, an employer should be able to allow them to elevate their leg, but during the break period, unless

---

[7] "SVP," or Specific Vocational Preparation, "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Dictionary of Occupational Titles, Appendix C: Components of the Definition Trailer*, occupationalinfo.org, https://perma.cc/32SG-62SH.  SVP 2 refers to a vocation a typical worker could perform with the following job training: "Anything beyond short demonstration up to and including 1 month."  *Id.*

[8] Dictionary of Occupational Titles.  *See id.*

14

an extended period of breaks were provided, which would be outside accommodation of the normal breaks.

. . .

Q.  I said that a person who is using their breaks to go to the bathroom and also get lunch would not be able to, during that same period of time, 100% of the time, be elevating their leg above their heart, right?

A.  Correct.  Because they would be doing other things such as going to the bathroom and getting something to eat.  And again, that's based on my professional opinion and expertise.

(Tr. 1426–28).

## B.  The ALJ Decision

The ALJ applied the five-step framework set forth in 20 C.F.R. § 416.920(a)(4).  At step one, the ALJ determined that Plaintiff is not engaged in substantial gainful activity.  (Tr. 1361).  At step two, the ALJ determined that Plaintiff has the following severe impairments: gouty arthritis, rheumatoid arthritis left foot unspecified, arthralgia left ankle, sciatica, posterior tibial tendon dysfunction, obesity, unspecified depressive disorder, anxiety, and borderline intellectual functioning.  (*Id.*).  The ALJ also found that Plaintiff has the following non-severe impairments: blood-clotting disorder/polycythemia, inactive TB, low blood potassium, PCOS, plantar fasciitis, dermatitis, asthma, hyperlipidemia, hypertension, vitamin D deficiency, migraine headaches, and sinus tachycardia.  (*Id.*).

At step three, the ALJ found that none of Plaintiff's impairments or a combination thereof meet or medically equal the severity of one of the listed impairments in the Code of Federal Regulations.  (Tr. 1362).  The listed impairments addressed in the ALJ decision related to Plaintiff's left ankle all required documentation of at least one of the following:  "(1) a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; (2) an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a

documented medical need for a one-handed, hand-held assistive device that requires the use of your other upper extremity or a wheeled and seated mobility device involving the use of one hand; or (3) an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements." (Tr. 1362–63) (internal references omitted). The ALJ determined that the record does not support a device that meets any of the above criteria.

Disability based on of inflammatory arthritis requires: "(A) persistent inflammation or deformity of a major weight-bearing joint resulting in the inability to ambulate, or involvement of a major peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively; (B) inflammation or deformity in one or more major joints with involvement of two or more organs body system with one of the organs body systems involved at least to a moderate level of severity, and at least two constitutional symptoms or signs; (C) ankylosing spondylitis or other spondyloarthropathies; or (D) repeated manifestations of inflammatory arthritis with at least two constitutional symptoms or signs, and one of the following markedly limited: activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." (Tr. 1363–64). The ALJ found: "The record does not support that the claimant experienced flare-ups during the relevant period with any degree of frequency, intensity, or functional restriction required for this Listing." (Tr. 1364). The ALJ summarized this analysis by concluding that "there are no persuasive medical opinions of record indicating that any of the claimant's mental or physical impairments meet or equal any of the listed impairments" in the Code. (Tr. 1370).

The ALJ ultimately concluded, upon consideration of the entire record, that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and

416.967(b) except frequently climb ramps or stairs; never climb ladders ropes, or scaffolds; frequently kneel, crouch, or crawl; never have exposure to hazards (unprotected heights/dangerous machinery/commercial driving); limited to performing simple, routine tasks, but not at a production rate pace; and limited to occasional routine workplace changes." (*Id.*). Reviewing the record, the ALJ noted Plaintiff's problems standing for long periods due to left ankle swelling and pain; she walks slowly; she has issues with standing, walking, and climbing stairs; she has some issues with self-care due to being unsteady on her feet; she uses a cane or ambulation device; and she does not handle stress or changes in routine well. (Tr. 1371). That said:

> [Plaintiff] noted that she is able to prepare meals daily; she is able to complete chores such as cleaning and laundry; she gets around 2-3 times per day; she is able to drive and ride in a car; she can go out alone; she is able to shop in stores for groceries, clothes, and petfood; she is able to pay bills, count change, and handle a savings account; she spends time with others regularly; she does not have issues getting along with family, friends, neighbors, or others; she can follow simple instructions; and on days she does not work, she gets up at 9am, walks her dog, straightens the house, goes to medical appointments, and keeps her feet elevated.

(*Id.*). Moreover, at her April 25, 2019 consultative exam, Plaintiff added to the above list that "she is a high school graduate from the LD[9] program; she achieved Cs and Ds; she had friends in school and got along with others; she was not a behavioral concern in school; she denied having issues being around people, but does not like large crowds;[10] she has a debit card; she does dishes, vacuuming, and laundry; she has hobbies including coloring, painting, and watching movies; she has two friends she interacts with regularly; she likes going to thrift stores, looking for bargains." (Tr. 1372).

---

[9] "LD" stands for learning disability. *Introduction to Learning Disabilities*, National Association of Special Education Teachers, https://perma.cc/UW2H-3LB2.

[10] This is inconsistent with Plaintiff's Cedar Point annual season pass.

At a prior social security hearing (May 20, 2020), Plaintiff testified that she does the dishes, laundry, and walks her dog for 15 minutes around the front yard; she could bathe and dress herself and drive around 12 minutes; she occasionally gets on the internet to play games or watch videos; if she stays on her feet for a long time, she gets a large bulge on her ankle; it takes her two hours to do the dishes because she has to start and stop due to foot pain.  (*Id.*).

The ALJ explained that Plaintiff's attorney "alleged disability due to a combination of cane use, leg elevation (to reduce pain and swelling), resulting in the inability to sustain work on full-time competitive basis."  (*Id.*).  The ALJ noted, however, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*).  The ALJ noted the number of practitioners who observed Plaintiff's "normal gait" and Plaintiff's description of her physical health as "good" on June 9, 2022.  (Tr. 1373–77).  The ALJ concluded that this evidence "supports physical functional limitations, but not to the extent alleged."  (Tr. 1377).

The ALJ made specific findings regarding leg elevation.  (Tr. 1379–80).  The ALJ cited each of the practitioners who recommended leg elevation, and to what extent.  (Tr. 1379).  The ALJ noted that Dr. Debarr's recommendation for "daily" leg elevation "did not specify that [Plaintiff] had to elevate her leg at a particular time of the day.  Therefore, [Plaintiff] could elevate her leg after work and still be compliant with Dr. Debarr's recommendation."  (*Id.*).

According to the ALJ:

> Dr. Mathai opined that [Plaintiff] had to elevate her leg during the "workday" because that is what the form provided by [Plaintiff's attorney] asked for.  Dr. Mathai never explained why the leg elevation had to be limited to work hours as opposed to some other times, so her opinion is not well supported.  While elevating the leg above heart level may reduce the swelling, there is no support in the record for the opinion that the leg elevation has to be limited to work hours, whatever those hours might be.  Neither is there evidence in the file that [Plaintiff] will derive more benefit

from elevating her leg during work hours than she would any other time of
day.

(*Id.*).  The ALJ also observed:

> [Plaintiff] is a season pass holder at Cedar Point.  She does chores, visits art
> museums, car shows, and walks her dog twice a day.  It is not likely that
> [Plaintiff] is elevating her leg above heart level when engaging in those
> leisurely activities.  Therefore, again, while elevating her leg may be
> therapeutic, it does not have to be limited to work hours.  The state agency
> medical consultants also had the benefit of significant portions of the
> medical record specifically addressing the claimant's symptoms, diagnoses,
> and imaging relating to her lower extremity impairments, and they did not
> include the need for foot/leg elevation in their opinions.  For these reasons,
> [Plaintiff's] allegations of the need to elevate her legs throughout what
> could be a work-day, are not entirely consistent with the evidence.

(Tr. 1379–80).

Regarding Plaintiff's need for a cane, the ALJ found that her cane has not been medically

necessary.  (Tr. 1380).  The ALJ came to this conclusion by comparing Plaintiff's prescription of

a cane (from March 18, 2019) with the number of treatment notes in which Plaintiff answered "no"

to whether she was "currently using an ambulatory assistive device."  (*Id.*) (citing 14 separate

treatment notes between April 2, 2019, and March 5, 2020).  Further, on November 11, 2019,

Plaintiff told Dr. Davis that she does not like to use her cane due to her young age.  (*Id.*).  The ALJ

also noted that none of the treatment notes between February 21, 2019, and November 17, 2022,

refer to Plaintiff's use of an ambulatory aid.  (Tr. 1381).

As for the persuasiveness of Dr. Debarr's, physical therapist Jodi Richards, and Dr.

Mathai's medical opinions, the ALJ stated:

> I find not persuasive the opinion of the claimant's podiatrist Colleen Debarr,
> DPM, dated August 1, 2019.  Dr. Debarr directed the claimant to rest and
> elevate her left foot/ankle daily.  This opinion is unpersuasive because it is
> not specific as to the height, duration, regularity or frequency.  It is
> otherwise inconsistent with the record as to the possibility that the claimant
> can rest and elevate during no[n] work hours.  Accordingly, the opinion is
> unpersuasive.  [Plaintiff's] physical therapist, Jodi Richards, PT, dated May

19

3, 2019, noted that she "discussed elevation and ice as much as possible to decrease edema." This opinion is unpersuasive because it is not specific as to the height, duration, regularity, or frequency. It is otherwise inconsistent with the record as to the possibility that [Plaintiff] can rest and elevate during non working hours. Accordingly, the opinion is unpersuasive.

I find not persuasive the opinion of [Plaintiff's] physician, Susan Mathai, M.D., dated January 30, 2023. She noted that [Plaintiff] has left ankle swelling and pain due to inflammatory arthritis and that she recommends that she elevate her leg above heart level for one hour during an eight-hour workday "to relieve patient from swelling which in turn worsens the pain." The elevation was indicated for "> 5 years." She noted her period of treating [Plaintiff] had been April 3, 2019 through November 17, 2022. This opinion is unpersuasive because Dr. Mathai never explained why the leg elevation had to be limited to work hours as opposed to some other times, so her opinion is not well supported. While elevating the leg above heart level may reduce swelling, there is no support in the record for the opinion that the leg elevation has to be limited to work hours, whatever those hours might be. Neither is there evidence in the file that [Plaintiff] will derive more benefit from elevating her leg during work hours than she would any other time of day. Accordingly, the opinion is not persuasive.

I find unpersuasive the opinion so the claimant's physician Susan Mathai, M.D., dated July 19, 2021 and April 12, 2021, wherein she opined that [Plaintiff] "is not able to work at [this] time due to joint pain and swelling. These opinions address the ultimate issue of disability, which is reserved to the Commissioner.

(Tr. 1385–86).

Moving on to step four, the ALJ determined that Plaintiff could not perform her past relevant work; all the same, transferability of job skills was not an issue because Plaintiff's prior work was unskilled. (Tr. 1387). At step five, the ALJ adopted the opinion of the vocational expert and found that Plaintiff could perform the requirements of merchandise marker, routing clerk, and officer helper. (Tr. 1388).

20

III.     **PROCEDURAL POSTURE**

A.  **The R&R**

The Magistrate Judge found that the ALJ "erred in her evaluation of opinion evidence supporting [Plaintiff's] need to elevate her leg during the workday."  (ECF No. 12, PageID #2385).  According to the R&R, the ALJ contorted her decision to "fit a preconceived RFC determination – namely, that it is unnecessary for [Plaintiff] to need to elevate her legs during the workday."  (*Id.* at PageID #2387).  So finding, the Magistrate Judge explained:

> I first note the ALJ relied on the opinions given by the state agency reviewing physicians finding them persuasive "because they are supported by the evidence the doctors reviewed, and they are consistent with the other evidence of record.  The evidence of record developed after they rendered their opinions did not change materially or in a manner that would otherwise render their opinions inconsistent with the record generally."  (Tr. 1384).  However, I find error in the ALJ's statement that the evidence of record did not change materially after their opinions were rendered.  These reviewers did not have the benefit of Dr. Mathai's opinion that [Plaintiff] needed to elevate her leg for an hour during the workday, which was not issued until January 2023, nearly four years after Dr. Siddiqui rendered his opinion.

(*Id.* at PageID #2387–88).  The Magistrate Judge noted that the ALJ may rely on earlier opinion evidence but must also fairly consider later evidence.  (*Id.* at PageID #2388).  The Magistrate Judge held that the ALJ "did not fairly consider the later-dated evidence."  (*Id.*).

Regarding Dr. Mathai's opinion in particular, the Magistrate Judge observed that Dr. Mathai responded to a question asking how many hours Plaintiff needed to elevate her leg during a workday; it is therefore obvious that Dr. Mathai's opinion is that Plaintiff must elevate her leg during the workday.  (*Id.* at PageID #2390).  "Nonetheless, the ALJ fails to discuss the consistency of Dr. Mathai's opinion that [Plaintiff] needs to elevate her leg above heart level for one hour during an eight-hour workday with treatment notes from Dr. Debarr and [Plaintiff's] physical therapists indicating [Plaintiff] needs to ice and elevate her leg to reduce swelling in her left ankle."

(*Id.*).  Therefore, the Magistrate Judge concluded that the ALJ failed to explain her decision based on "supportability" and "consistency."  (*Id.*).  Moreover, the Magistrate Judge called the ALJ's decision "circuitous," where it discusses evidence consistent with Plaintiff's need to elevate her leg but does not "complete the loop" to explain why it is discounted; this shows a failure to create a logical bridge, requiring remand to the Commissioner.  (*Id.*).

## B.  The Commissioner's Objection

The Commissioner argues that the Magistrate Judge erred when he concluded that the ALJ improperly evaluated opinion evidence supporting Plaintiff's need to elevate her leg during the workday.  (ECF No. 13, PageID #2392).  As for Dr. Mathai's opinion that Plaintiff must elevate her leg "during the workday," the Commissioner argues that the ALJ adequately addressed supportability "[s]ince the ALJ considered the evidence Dr. Mathai relied on in forming her opinion but concluded that the doctor failed to explain the basis for the limitation."  (*Id.* at PageID #2393).

The Commissioner also explains that the ALJ considered the consistency of Dr. Mathai's opinion with the record; the ALJ noted that Plaintiff held a season pass to Cedar Point, did chores, visited art museums and car shows, and walked her dog twice a day, and it was unlikely that Plaintiff was elevating her legs above heart level when engaging in those leisurely activities.  (*Id.*) (citing Tr. 1379).  Furthermore, the state agency medical consultants had a significant portion of the medical record addressing Plaintiff's ankle pain and swelling, but did not opine that Plaintiff needed to elevate her foot or leg.  (*Id.* at PageID #2393–94).  This also contributed to the ALJ's decision that Dr. Mathai's opinion was unpersuasive.  (*Id.* at PageID #2394).

The Commissioner argues that the Magistrate Judge disregarded the record as a whole; while the R&R addressed the latter portions of the ALJ decision discussing Dr. Mathai's opinion

(Tr. 1385–86), it does not address the ALJ's earlier discussion of Dr. Mathai's opinion in which the ALJ acknowledged, "Dr. Mathai opined that [Plaintiff] had to elevate her leg during the 'workday' because that is what the form provided." (*Id.* at PageID #2395) (citing Tr. 1379).  After acknowledging that Dr. Mathai's opinion was given in response to a question on a form, the ALJ explained why Dr. Mathai's opinion was inconsistent with Plaintiff's daily and leisurely activities and the findings of the state agency medical consultants. (*Id.*).  The Commissioner argues that the Magistrate Judge overlooked Plaintiff's reported daily activities when he found that the ALJ did not adequately consider Dr. Mathai's opinion. (*Id.* at PageID #2397).

### C.  Plaintiff's Response

Plaintiff responds that the Magistrate Judge rightfully rejected the ALJ's finding and recommended remand. (ECF No. 14, PageID #2399).  Echoing the R&R, Plaintiff explains: "Dr. Mathai did not say that Ms. Nichols would only need to elevate her leg once during a 24-hour period.  She merely addressed what [Plaintiff] would need over the course of an eight-hour workday." (*Id.* at PageID #2401).  With regard to the consistency of Dr. Mathai's opinion with the whole of the record, Plaintiff defends the Magistrate Judge's determination that the ALJ did not fairly consider Dr. Mathai's later-dated opinion. (*Id.* at PageID #2402).

Plaintiff explains that the gap in time between the rest of the record and Dr. Mathai's opinion was not the Magistrate Judge's only basis for finding that the record had materially changed. (*Id.* at PageID #2403).  For example, state agency reviewing physicians did not address existing evidence concerning Plaintiff's need to elevate her legs. (*Id.*).  Neither did they have the reports documenting Plaintiff's edema, nor the MRI in October 2019 showing synovitis/effusion with associated bone marrow edema suspicious of inflammatory arthritis. (*Id.*).  Plaintiff claims that these records demonstrate continued and worsening issues with pain and swelling; along with

Dr. Mathai's opinion, these findings represent material changes in the record.  (*Id.* at PageID #2404).

Plaintiff also argues that, while the ALJ considered her activities, she did not consider the limitations on those activities.  (*Id.* at PageID #2404–05).  Plaintiff can do the dishes, but it takes her two hours due to pain; she can make meals, but only small ones; she can walk her dog, but she does not leave her property; she can drive, but only short distances.  (*Id.*).  The ALJ also did not credit Plaintiff's testimony that, while at Cedar Point, she manages her leg swelling by taking breaks, sitting on the bench with her feet on the back of the bench.  (*Id.* at PageID #2405).  To the extent that these activities are performed intermittently, they do not suggest that Plaintiff can engage in substantial gainful activity.  (*Id.*) (citing *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967).  Rather, activities of daily living are relevant only if they document an ability to perform such activities on a sustained basis.  (*Id.* at PageID #2405–06) (citing *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377–78 (6th Cir. 2013)).

## IV.  LEGAL STANDARD

An ALJ employs a five-step sequential process to determine whether a person is disabled.  20 C.F.R. 416.920(a)(4); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006).  As the Sixth Circuit has explained:

> First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b)(2000)).  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c)(2000)).  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d) (2000).  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant

24

> work, plaintiff is not disabled.  For the fifth and final step, even if the
> plaintiff's impairment does prevent her from doing her past relevant work,
> if other work exists in the national economy that plaintiff can perform,
> plaintiff is not disabled.

*Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbott v. Sullivan*, 905

F.2d 918, 923 (6th Cir. 1990)) (internal citations omitted).  At step four, as part of determining a

claimant's RFC in light of the evidence before her, the ALJ must explain how she considered the

supportability and consistency of the medical opinions and administrative findings before her.  20

C.F.R. § 404.1520c(c)(1) & (2).  The Court weighs the supportability and consistency of a given

medical opinion against the other medical and nonmedical opinions in the record:  Regarding

supportability, "The more relevant the objective medical evidence and supporting explanations

presented by a medical source are to support his or her medical opinion(s) or prior administrative

medical finding(s), the more persuasive the medical opinions or prior administrative medical

findings will be."  20 C.F.R. § 404.1520c(c)(1).  Regarding consistency, "The more consistent a

medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)

or prior administrative finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

According to 42 U.S.C. 405(g), courts reviewing the Commissioner's final decision

determine whether it is supported by substantial evidence and whether proper legal standards were

applied: "The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive."  "Substantial evidence" is not a high threshold. *Biestek*

*v. Berryhill*, 587 U.S. 97, 102–03 (2019).  "It means—and means only—'such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  "[T]he Commissioner's decision cannot be

overturned if substantial evidence, or even a preponderance of the evidence, supports the

claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  That said, if the reasons given by the ALJ for her decision "do not build an accurate and logical bridge between the evidence and the result," a reviewing court cannot affirm. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).  The ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s)."  20 C.F.R. § 404.1520c(a)).

The reviewing court is limited to evaluating whether the ALJ's explanations "are reasonable and supported by substantial evidence in the record; the court "accord[s] the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court does] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476; *see Heston*, 245 F.3d at 536 (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("It [i]s for the Secretary and his examiner, as the fact finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony.").  The ALJ thus enjoys a "zone of choice" to decide between the parties' competing positions "without the fear of appellate court interference."  *Arnett v. Comm'r of Soc. Sec.*, 76 F. App'x 713, 716 (6th Cir. 2003) (citing *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986)).

## V.    DISCUSSION

Magistrate Judge Sheperd found "error in the ALJ's statement that the evidence of record did not materially change" after the state agency reviewing physicians rendered their opinions because the state agency physicians "did not have the benefit of Dr. Mathai's opinion that Nichols needed to elevate her leg for an hour during the workday."  (ECF No. 12, PageID #2388).  The Court disagrees that the evidence materially changed after the state agency physicians issued their

reports. Dr. Siddiqui, based on the medical records in his possession, opined that Plaintiff could sit, stand, and/or walk for a total of six hours in an eight-hour workday. (Tr. 75). That is consistent with, and less restrictive than, Dr. Mathai's opinion that Plaintiff needed only elevate her leg for one hour during an eight-hour workday; Dr. Mathai's opinion implies that Plaintiff could sit, stand, and/or walk for a total of seven hours in an eight-hour workday. (Tr. 2239).

The Court also disagrees that the ALJ failed to explain her reasoning for discounting Dr. Mathai's opinion. The ALJ stated: "Dr. Mathai never explained why the leg elevation had to be limited to work hours as opposed to some other times, so her opinion is not well supported." (Tr. 1379). Indeed, as the ALJ pointed out, Dr. Mathai produced this opinion in response to a form. (*Id.*; Tr. 2239). The form included a space for Dr. Mathai to explain her opinions; in this section, she wrote, "I will attach my last office note[.] She has objective findings of inflammatory arthritis of left ankle [illegible][.] Physical exam as well as MRI findings show evidence of inflammatory arthritis." (Tr. 2240). Neither Dr. Mathai's comment, nor the office notes attached to the form, explain why Plaintiff needed to elevate her leg during the workday as opposed to other times of the day. The ALJ also observed that Dr. Debarr's recommendation was that Plaintiff elevate her leg "daily," which was inconsistent with Dr. Mathai's opinion. (Tr. 1379).

Supportability depends not only on objective medical evidence, but also on the physician's supporting explanations of that medical evidence. 20 C.F.R. § 404.1520c(c)(1). The Magistrate Judge acknowledges that the ALJ found Dr. Mathai's opinion insufficient "because Dr. Math[ai] never explained why the leg elevation had to be limited to work hours as opposed to some other times[.]" (ECF No. 12, PageID #2389). That finding is consistent with the ALJ's duty to discuss the supportability of the opinion. Yet the Magistrate Judge points to that finding to attack what he sees as the ALJ's failure to understand the substance of Dr. Mathai's opinion rather than what the

ALJ's decision actually states.  (*Id.* at PageID #2390).  According to the R&R, the mere existence of Dr. Mathai's opinion—without any supporting explanation for that opinion—materially changed Plaintiff's medical record; the ALJ's failure to find it persuasive represents a failure to complete the "logical bridge."  Not only are these conclusions unsupported by the record, but the Code of Federal Regulations demands more to establish supportability, and *far* more to reverse the ALJ's decision.

The ALJ fairly considered—and fairly discounted—Dr. Mathai's report.  Even if Dr. Mathai's report is substantial evidence of a finding of disability, and even if Dr. Mathai's opinion is consistent with two other opinions in the record (which the ALJ found unpersuasive), the ALJ's decision is also supported by substantial evidence.  The state agency physicians reviewed the majority of Plaintiff's medical record and did not conclude that she needed to elevate her leg during the workday.  (Tr. 75).  Those opinions include supporting explanations: each includes long lists of the inquiries performed by the state agency physicians into Plaintiff's case that contributed to their conclusions.  (Tr. 74–78; 115–128).  It is thus unsurprising that the ALJ found those opinions more persuasive than Dr. Mathai's opinion; the Code instructs, "The more relevant the objective medical evidence ***and supporting explanations*** presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative finding(s) will be."   20 C.F.R.  §  404.152c(c)(1) (emphasis added).

The ALJ also determined that Plaintiff's activities of daily living did not support a finding of disability.  (Tr. 1379).  In her objection to the R&R, Plaintiff argues that the ALJ did not properly credit her testimony regarding the time it takes her to perform those activities.  (ECF No. 14, PageID #2404–05).  However, the ALJ alone determines witness credibility.  *Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).  In any event, the ALJ's failure to credit Plaintiff's testimony regarding the limitations on her activities of daily living is consistent with the state agency physicians' conclusion that Plaintiff's "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were not] substantiated by the objective medical evidence alone."  (Tr. 74; 89).

The Court finds that the ALJ's decision is supported by substantial evidence, and that she built "an accurate and logical bridge" between the evidence in the record and her conclusion. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).  The ALJ addressed the supportability and consistency of Dr. Mathai's opinion and found it unpersuasive.  The Court therefore **AFFIRMS** the ALJ's decision.

## VI.    CONCLUSION

The Court finds that the Magistrate Judge substituted his judgment for that of the ALJ. When considering the record as a whole, the ALJ's decision was supported by substantial evidence and therefore must be affirmed.  The Court therefore **REVERSES** the R&R and holds that the ALJ's decision must be **AFFIRMED** as to Plaintiff's issue one.  Since the Magistrate Judge did not consider Plaintiff's issue two, this matter is **REMANDED** to Magistrate Judge Sheperd for further proceedings consistent with this order and to issue an R&R with regard to issue two.

**IT IS SO ORDERED**

Date: July 21, 2025

_____

**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**