IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA S. NICHOLS, | ) | Case No. 1:23-cv-02063-CEF |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Pamela Nichols ("Nichols"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Nichols's applications for DIB and SSI be affirmed.

## II.      Procedural History[1]

Nichols filed for DIB and SSI on March 11, 2019, alleging a disability onset date of December 20, 2018. (Tr. 66, 81). The claims were denied initially and on reconsideration. (Tr.

---

[1] I provide here the procedural history and evidence from the earlier Report and Recommendation dated June 21, 2024. (ECF Doc. 12).

79, 94, 112, 128). She then requested a hearing before an ALJ. (Tr. 152). Nichols (represented by counsel) and a vocational expert ("VE") testified before the ALJ on May 19, 2020. (Tr. 37-63). On June 30, 2020, the ALJ issued a written decision finding Nichols not disabled. (Tr. 12-31). The Appeals Council denied her request for review on December 20, 2020. (Tr. 1-5). Nichols then filed her first appeal in this Court on February 12, 2021. (Tr. 1444-46). That case was remanded on November 23, 2021, based on a joint stipulation by the parties. (Tr. 1440-43).

On remand, a hearing was held before the ALJ on February 9, 2023. (Tr. 1397-1429). The ALJ issued a written decision again denying benefits on March 21, 2023. (Tr. 1355-89). Nichols appealed this unfavorable decision, and the Appeals Council again declined review on August 24, 2023, making the ALJ's 2023 decision the final decision of the Commissioner. (Tr. 1348-51; *see* 20 C.F.R. §§ 404.955, 404.981).

Nichols timely filed her complaint in this Court on October 20, 2023. (ECF Doc. 1). On June 21, 2024, I issued an initial Report and Recommendation (ECF Doc. 12) only as to Issue One, which I determined was dispositive and did not reach the second issue. The District Judge reversed on July 21, 2025 and remanded the case back to me for consideration of Plaintiff's Issue Two. (ECF Doc. 15).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Nichols was 35 years old on the alleged onset date, making her a younger individual according to Agency regulations. (*See* Tr. 1387). She graduated from high school. (*Id.*). In the past, she worked as a cashier and a laundry worker. (*Id.*).

### B.  Relevant Medical Evidence[2]

On February 21, 2018, Nichols met with her primary care physician, Ilona Jurek, M.D. and complained of left ankle pain. (Tr. 667). She had a mass on the side of her left foot. (*Id.*). She reported having been prescribed a boot by a Dr. McCartney which helped for three weeks, but pain and swelling returned. (*Id.*). She was using ice, heat, elevation, and compression stockings without relief. (*Id.*). On examination, she had a soft tender mass on the lateral malleolus of the left ankle, increased warmth, and surrounding erythema. (Tr. 668). The bottom of the foot and toes were unremarkable, there was no calf tenderness, and gait appeared normal. (*Id.*). She was diagnosed with acute left ankle pain (uric acid) and instructed to return in two weeks. (*Id.*).

Nichols returned to Dr. Jurek on April 5, 2018, complaining of left ankle pain and swelling for three months and reported that after being on her feet all day her left ankle becomes very swollen. (Tr. 665). On examination, her left ankle was tender along the lateral ligaments and at insertion of the plantar fascia in her heel, with no erythema or swelling. (Tr. 666). She was able to bear weight. (*Id.*). Dr. Jurek diagnosed her with gouty arthritis, prescribed ibuprofen 800 mg, and made a referral to physical therapy. (Tr. 665).

Nichols completed nine sessions of physical therapy biweekly through April and May 2018. (Tr. 643-65). During these visits, the physical therapist noted left ankle pain, decreased left ankle range of motion, decreased lower extremity strength, and difficulty with ambulation. (Tr. 645, 648, 650, 652, 654, 656, 659, 660, 663). The physical therapist also observed pain, swelling,

---

[2] Nichols raises error only with respect to her physical impairments. (ECF Doc. 9, p. 3 n.1). I summarize here the medical evidence relevant to those claims; all other claims are deemed waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

and impaired gait. (Tr. 650, 653, 661-62). Gabrielle Drenski, PTA, recommended Nichols elevate and ice her ankle "as much as possible to decrease edema." (Tr. 650).

After gaining improved bilateral lower extremity strength, Nichols requested discharge due to financial limitations and losing her health insurance. (Tr. 643-44). She reported feeling 60% functional but had continued deficits in her left ankle range of motion and intermittent increased pain levels with prolonged activities. (Tr. 643). She was independent with her home exercise plan and was recommended to continue post-discharge in order to maintain her current level of functional abilities. (*Id.*).

On February 22, 2019, Nichols called Dr. Jurek to report that her ankle was getting bigger, and that she was having trouble walking. (Tr. 639). Dr. Jurek indicated she would refer Nichols to Cleveland Clinic podiatrists because she felt Nichols required more aggressive treatment. (*Id.*).

On March 6, 2019, Nichols met with podiatrist Colleen Debarr, D.P.M. complaining of pain and swelling in her left ankle and foot. (Tr. 764-65). On examination, Dr. Debarr noted tenderness and deformity of the left foot, decreased arch height upon weightbearing, collapse of the medial longitudinal arch, decreased range of motion, pain with palpation, and too many toe sign. (Tr. 765). Gait analysis demonstrated flexible deformity pronation through the gait cycle and mild genu valgum. (*Id.*). X-ray revealed no evidence of fracture, a small heel spur, and possible soft tissue swelling in the calf and ankle. (*Id.*). Dr. Debarr sent a prescription for custom orthotics, applied ankle strapping to the left ankle, and recommended stretching exercises and wearing compression stockings daily. (Tr. 766).

On March 18, 2019, Nichols reported to Dr. Jurek's office and met with Raquel Grant-Venable, PA-C, for follow up on her left ankle swelling. (Tr. 1296). Nichols reported she took

4

the antibiotic course and her swelling was unchanged; she had also met with podiatry and was told she needed special inserts for her shoes, and she was recommended a brace and compression stockings. (Tr. 1296, 1301). On examination, Nichols had edema and tenderness in her left ankle, with normal range of motion and normal pulse. (Tr. 1304). She was ANA positive and was scheduled to see rheumatology in July. (Tr. 1296, 1301.). PA Grant-Venable prescribed Nichols a handicap placard and 4-prong cane. (Tr. 1304).

On April 3, 2019, Nichols met with rheumatologist Susan Mathai, M.D. and complained of constant pain and swelling, worsened with activity. (Tr. 926). On examination, she had normal gait and station; most joints were normal, without pain, swelling, tenderness, deformity, and had full range of motion. (Tr. 929). However, her left ankle had diffuse swelling and pain on all range of motion. (*Id.*). Dr. Mathai noted the left ankle pain with positive ANA, elevated sedimentation rate, and malar rash were suspicious for inflammatory arthritis. (Tr. 930). She recommended considering a trial of steroids after completing imaging. (*Id.*).

Nichols presented to the Cleveland Clinic emergency department on April 13, 2019, complaining of left lower extremity pain, swelling, and rash. (Tr. 959). On examination, she had edema and blanchable erythema scattered from distal anterior to mid tibia/fibula. (Tr. 961). She was given Keflex and doxycycline and recommended to follow up with her primary care physician ("PCP"). (Tr. 959).

On April 25, 2019, Nichols attended a psychological evaluation conducted by James Spindler, M.S., referred by Opportunities for Ohioans with Disability. (Tr. 396). At this evaluation, she reported inability to work because of pain, and because her left ankle swells and she cannot stand on it. (Tr. 396, 398). She was working part-time, 14 hours per week, in the housekeeping department of a nursing home. (Tr. 399). She was able to care for her dog and

helped her father with household chores such as washing dishes, vacuuming, and doing laundry. (Tr. 399-400). She reported difficulty sleeping due to left ankle pain. (Tr. 399). Dr. Spindler observed that Nichols's gait appeared to favor her left side. (Tr. 398).

Nichols returned to rheumatology for follow up on May 7, 2019, and treated with Deshawn Jones, APRN, CNP. (Tr. 980). She completed antibiotics and her symptoms improved, but she continued to have left ankle swelling and pain. (Tr. 982). She was using her prescribed insoles and taking ibuprofen with some relief, but her pain would worsen after working or if she stood too long. (Id.). On examination, her left ankle was tender and swollen but her gait was normal. (Tr. 984). She was advised to schedule an ultrasound of her ankle, continue ibuprofen as needed, and to consider a steroid trial after the ultrasound was completed. (Tr. 987).

On June 12, 2019, Nichols followed up with Dr. Mathai. (Tr. 995). Ultrasound results demonstrated mild to moderate left tibiotalar synovitis and subcutaneous edema around the left ankle. (Id.). Dr. Mathai reviewed the medications and therapies tried, noting that steroids and an ankle boot did not help, physical therapy helped temporarily, and ibuprofen and Voltaren provided relief. (Id.). On examination, Nichols's gait and station was normal, and all joints were normal and without pain, tenderness, swelling, or deformity, and had full range of motion. (Tr. 997). Dr. Mathai prescribed Plaquenil. (Tr. 998).

On August 1, 2019, Nichols followed up with Dr. Debarr and reported that her orthotics were too painful to wear, she was taking ibuprofen 800 mg daily for arthritis pain, and that she continued to wear the ankle strapping with some relief. (Tr. 1003). On examination, Dr. Debarr again noted tenderness and deformity of the left foot, decreased arch height upon weightbearing, collapse of the medial longitudinal arch, decreased range of motion, pain with palpation, and too many toe sign. (Tr. 1004). Gait analysis demonstrated flexible deformity pronation through the

6

gait cycle and mild genu valgum. (*Id.*). Dr. Debarr diagnosed pain in left foot, posterior tibial

tendon dysfunction, bone spur, and plantar fasciitis. (*Id.*). Dr. Debarr applied ankle strapping;

recommended Nichols continue wearing supportive shoes and custom orthotics and to follow up

with the clinic to adjust her inserts; and recommended she "rest and elevate daily." (*Id.*).

Nichols met with endocrinologist Rami Alrezk, M.D., on September 5, 2019. (Tr. 1008).

At this visit, Dr. Alrezk observed lower extremity edema. (Tr. 1012). He recommended exercise

three times per week to help with her obesity. (*Id.*). When she stated she was unable to exercise

due to foot pain, he suggested pool exercises. (*Id.*). Dr. Alrezk again observed edema of the

lower extremity on October 16, 2019. (Tr. 1045). Nichols had normal gait. (*Id.*).

Nichols met with Dr. Mathai on October 9, 2019, with continued complaints of pain in

her left foot and ankle. (Tr. 1028). Nichols reported that the swelling persists throughout the day,

worsens in the afternoon, and that the pain was constant and worsening; she had no pain in other

joints. (*Id.*). Plaquenil had not improved her symptoms. (*Id.*). On examination, she had normal

gait and station, and all joints were normal, except for her left ankle, which had diffuse swelling

and pain on range of motion. (Tr. 1033). Dr. Mathai also noted swelling in the lower aspect of

the left leg. (*Id.*). Dr. Mathai noted no improvement on steroids, NSAIDs, and Plaquenil. (*Id.*).

There was no pain in other joints, nor other symptoms to suggest lupus. (*Id.*). Dr. Mathai referred

Nichols to orthopedics because medical management had not helped, and referred her to vascular

for chronic left ankle swelling, and planned to reassess thereafter. (*Id.*).

Nichols met with orthopedist Alan Davis, M.D. on October 28, 2019 on referral from Dr.

Mathai. (Tr. 1058). She reported left ankle swelling, present for three years, with increased

swelling at the end of an eight-hour day; her pain was sharp and rated at an eight on a ten-point

scale. (*Id.*). On examination, she had pes planus of both feet, an antalgic gait on the left, with

tenderness of the Achilles and peroneal tendons and limited range of motion at her left ankle.
(Tr. 1060). Dr. Davis ordered an MRI to better diagnose and assess appropriate treatment
options. (Tr. 1061). An MRI was obtained on November 1, 2019 and revealed talonavicular and
posterior subtalar synovitis/effusion with associated subarticular bone marrow edema suspicious
for inflammatory arthritis; the tibiotalar synovitis previously found via ultrasound had resolved.
(Tr. 1064). There was soft tissue edema within multiple joints of the left ankle as well as
subcutaneous edema circumferentially around the distal lower leg. (Tr. 1065). Nichols followed
up with Dr. Davis on November 11, 2019 to discuss the MRI results. (Tr. 1067). At this visit, she
reported significant pain that was not helped by ibuprofen 800 mg. (*Id.*). She reported having a
cane but did not like using it; she was also upset at having this much pain at her age. (*Id.*). On
examination she again had an antalgic gait on the left, with tenderness and limited range of
motion. (Tr. 1068). Dr. Davis diagnosed Nichols with left foot pain, pes planus of both feet, and
rheumatoid arthritis involving the left foot with unspecific rheumatoid factor presence. (Tr.
1070). After discussion, Nichols elected to proceed with a more comprehensive ankle brace and
a cortisone injection in her left ankle. (*Id.*).

Nichols followed up with Dr. Davis on February 26, 2020. (Tr. 1183). She reported
receiving three weeks of relief from the cortisone injection on November 11, 2019 and planned
to pick up her new orthotics the next month. (*Id.*). She continued to have swelling and reported
sharp pain at eight on a ten-point scale, but that ibuprofen 800 mg was helping with the pain.
(*Id.*). On examination, she had an antalgic gait on the left, swelling, tenderness at the Achilles
and peroneal tendons, and limited and painful range of motion. (Tr. 1184). Dr. Davis discussed
further injections and recommended follow up after obtaining her new brace. (*Id.*).

Nichols met with a vascular specialist, John Bartholomew, M.D., on February 28, 2020. (Tr. 1187). Examination revealed warm feet and toes, non-pitting edema, and ankle cut-off sign bilaterally. (Tr. 1188). Dr. Bartholomew observed that Nichols's left ankle was one-half inch greater than the right. (Tr. 1189). He noted Nichols has tibiotalar synovitis and that it might be a contributing factor to her swelling. (*Id.*). He also noted Nichols has a number of features consistent with lipedema, including ankle cut-off sign, non-pitting edema, retromalleolar fat pads, and hypothermia of her skin on her legs. (*Id.*). However, she did not have overt lymphedema as she had no Stemmer's sign and no pitting edema or squaring of her toes. (*Id.*). He recommended a trial of a custom fit below-the-knee support hose and follow up with orthopedics. (*Id.*).

Nichols presented for a telehealth follow up with Dr. Mathai on June 29, 2020. (Tr. 2117). Dr. Mathai noted that Nichols's ankle pain had been chronic for the past year along with positive ANA, elevated sedimentation rate (now normal) and malar rash. (Tr. 2122). She had trialed oral steroids, NSAIDs, and Plaquenil. (*Id.*). At a previous visit, Dr. Mathai continued Plaquenil but recommended considering methotrexate at the next visit if the ankle boot did not improve her symptoms. (*Id.*). At this visit, Nichols reported the boot given by orthopedics had not helped; Dr. Mathai stopped Plaquenil and started methotrexate. (Tr. 2123).

Nichols next attended an appointment with Dr. Mathai on April 7, 2021. (Tr. 2032). She reported that since the last visit, she had started methotrexate and prednisone, and that her pain was somewhat improved – from a ten to a seven – but she continued to have pain and swelling of her left ankle. (*Id.*). She reported both wrists had now become stiff and painful. (*Id.*). She stated that the methotrexate had helped to some extent. (Tr. 2036). Dr. Mathai continued the methotrexate, weaned prednisone, and started a biologic and Enbrel. (*Id.*).

Nichols had an infectious disease screening on April 4, 2021 prior to starting Enbrel, which was positive for latent tuberculosis. (Tr. 1998, 2004). Notes indicated she had not been immunized against COVID-19 because she needed to stop methotrexate for six weeks, which she could not do due to the severity of her symptoms. (Tr. 1998). On examination, she had chronic lymphedema, more on the left. (Tr. 2002). Infectious disease indicated that there was no need for re-treatment of the tuberculosis and that they would continue to monitor for symptoms during immunosuppression. (Tr. 2004).

On April 26, 2021, Nichols established primary care with Meaghan Beal, CNP, who noted she was on methotrexate and had not started Enbrel yet due to the positive tuberculosis test. (Tr. 1795). Nichols had lymphedema for which she elevated her legs and wore compression stockings. (*Id.*).

Nichols attended a follow up appointment with Dr. Mathai on September 16, 2021. (Tr. 1958). Dr. Mathai noted that she ambulated well but had mild pain and swelling in her left ankle, and no synovitis in other joints. (*Id.*). Nichols reported she was doing much better on the combination of Enbrel and methotrexate; she knew when she missed a dose of methotrexate, her joints would flare up. (Tr. 1959). Dr. Mathai continued these prescriptions. (*Id.*).

Nichols returned to Dr. Mathai on January 6, 2022 for an urgent visit due to numbness and tingling of both hands for the last few months. (Tr. 1928). She was dropping things and had positive Tinel's and Phalen's signs bilaterally. (Tr. 1929). Dr. Mathai suspected carpal tunnel syndrome and ordered an EMG. (*Id.*). The EMG was performed on January 20, 2022 and did not reveal carpal tunnel syndrome. (Tr. 1916).

Nichols next met with Dr. Mathai on March 17, 2022. (Tr. 1904). On examination, she ambulated well but had swelling and mild pain in her left ankle. (*Id.*). She also had pain over her

left hip, for which Dr. Mathai suspected bursitis from a recent fall. (*Id.*). She had no synovitis in other joints. (*Id.*). She had positive Tinel's and Phalen's signs bilaterally. (*Id.*). Dr. Mathai continued Nichols on Enbrel but reduced the methotrexate dosage due to elevated liver enzymes. (Tr. 1905).

Nichols followed up with Dr. Mathai on November 17, 2022. (Tr. 2233). Nichols had experienced two arthritic flare ups since her last visit, improved with steroids. (*Id.*). She had pain in both ankles but no other complaints at this visit. (*Id.*). She ambulated well but had swelling and mild pain in her left ankle, no synovitis in other joints. (Tr. 2236). Nichols had stopped Enbrel that month due to an aversion to self-injection. (Tr. 2233). Dr. Nichols stopped Enbrel and continued methotrexate. (Tr. 2237).

### C. Medical Opinion Evidence[3]

#### 1. State Agency Reviewers

State agency reviewing physician Mehr Siddiqui, M.D., reviewed Nichols's medical record on April 10, 2019. (Tr. 66-76). Dr. Siddiqui opined Nichols could perform light work with additional restrictions, including never climbing ladders/ropes/scaffolds and frequently climbing ramps/stairs, kneel, crouch, and crawl. (Tr. 74-76). She should avoid all exposure to hazards, including no unprotected heights, no heavy machinery, and no commercial driving. (Tr. 75-76). Dr. Siddiqui supported the exertional limitations by referencing vertigo and asthma; he also noted diffuse swelling

---

[3] The ALJ evaluated and found not persuasive the opinions of Colleen Debarr, DPM, Jodi Richards, PT, Raquel Grant-Venable, PA-C, and William Menard, PT. (Tr. 1385-86, citing Tr. 416, 650, 1004, 1304, 1845). I have reviewed these portions of the transcript and conclude that the ALJ was not referencing medical opinion evidence despite evaluating it as such. Rather, she was referencing treatment notes, *i.e.*, "other medical evidence," under the regulations. *See* 20 C.F.R. §§ 404.1513; 416.913. I also note the recommendation to ice and elevate her ankle "as much as possible" was made by Gabrielle Drenski, PTA, and countersigned by Jodi Richards, PT. (*Compare* Tr. Tr. 650-51 *with* 1385-86). Accordingly, I have included them in the medical evidence portion of this Report and Recommendation and do not recount them here.

of the left ankle and pain on all range of motion. (*Id.*). On September 18, 2019, Gerald Kloyp, M.D., affirmed Dr. Siddiqui's opinion. (Tr. 107-09).

### 2.  Treating Medical Providers

Dr. Mathai wrote two short opinion letters, dated April 12 and July 19, 2021, respectively. (Tr. 1967, 2012). In each, she stated Nichols was under her care for rheumatoid arthritis and "[s]he is not able to work at this time due to joint pain and swelling." (*Id.*).

Dr. Mathai also wrote a medical source statement on January 30, 2023. (Tr. 2239-40). In it, Dr. Mathai noted that she treated Nichols for inflammatory arthritis. (Tr. 2239). Dr. Mathai opined Nichols left ankle swelling and pain would require her to elevate her legs above heart level "to relieve patient from swelling which in turn worsens the pain." (*Id.*). She would need to elevate her legs for one hour during an eight-hour workday. (*Id.*). Leg elevation had been indicated for greater than five years. (Tr. 2239). Dr. Mathai had treated Nichols starting on April 3, 2019 and had last examined her on November 17, 2022. (Tr. 2240). Dr. Mathai concluded her opinion with the statement "I will attach my last office note she has objective findings of inflammatory arthritis of left ankle – physical exam as well as MRI findings show evidence of inflammatory arthritis." (*Id.*). Dr. Mathai included the November 17, 2022 treatment notes to confirm this statement. (Tr. 2241-50).

### D.  Administrative Hearing Evidence

Nichols testified at a post-remand hearing before the ALJ on February 9, 2023. (Tr. 1397). She testified she lived with her father, who worked the day shift from 5:30 a.m. to 2:30 p.m. (Tr. 1403). She graduated from high school and could drive but was very limited. (Tr. 1404). She would only drive close to her neighborhood in case she ran into issues. (Tr. 1418). She described an incident where she was driving to the bank ten minutes away from her house, but her knee stiffened up and she could not work the pedals any longer and needed to call her

12

mother to come and drive the car home. (*Id.*). Her mother or father would drive her to doctor's appointments. (*Id.*). Nichols received medical benefits and food stamps. (*Id.*).

She had last worked in spring of 2020. (Tr. 1405). She had to reduce her hours to limit the swelling in her legs because her ankles would look like grapefruits at the end of the workday. (Tr. 1419). She previously worked as a laundry worker; that work was medium exertional work but she had performed it at light according to testimony from the earlier hearing. (Tr. 1408). Nichols testified she was let go from this job during the pandemic because she couldn't get vaccinated due to her arthritis medications. (*Id.*). Her doctor recommended she take leave from work because of the number of COVID-19 cases at her facility. (Tr. 1409). She stated her employer let her go because "because of the fact I could not come back without the restrictions, because of COVID, and I could not get vaccinated." (*Id.*).

Nichols also described having difficulty walking, standing, and sitting. (*Id.*). Her feet will swell even while she is sitting; the swelling occurs unless she is resting and elevating her legs. (*Id.*). She takes methotrexate weekly and ibuprofen 800 mg every six hours to help the pain. (Tr. 1410). She had to stop Enbrel injections due to scar tissue in her stomach. (*Id.*). She rests and elevates her leg above her heart while lying flat, uses ice, compression stockings, and an orthopedic boot. (*Id.*). She elevates and ices her leg about 75% of the day. (Tr. 1419).  She uses a cane when she walks short distances, and a wheelchair for long distances. (Tr. 1410). She uses the cane inside the house and in the front yard, and to ambulate to the entrance of the grocery store, when she will get a motorized scooter. (*Id.*).

She also has chronic migraines occurring about twice per week for which she takes Topamax and Maxalt. (Tr. 1411). She becomes sensitive to light, sound, and smell, and cannot

do anything the rest of the day. (*Id.*). The medications help, but do not fully resolve the migraines. (*Id.*).

Nichols described having "pretty bad anxiety" for which she takes medication and speaks to a counselor twice per month. (*Id.*). She also described efforts to lose weight and had changed her diet to eat more salads and water and less fried food and soda. (Tr. 1421). She had been approved for gastric bypass surgery if she could lose 50 pounds. (Tr. 1420-21). However, she was having difficulty losing the weight due to lymphedema and PCOS. (*Id.*).

Nichols has difficulty caring for herself. (Tr. 1412). She has a very hard time taking showers and takes baths instead for fear of falling while she is alone at home. (*Id.*). She cut her hair short (it had hung to her thighs at the last hearing) because she could not care for it – arthritis in her hands would cause her fingers to go numb when she was brushing her hair. (*Id.*). She can cook small meals like oatmeal and toast for herself, but she must sit down for a while after. (Tr. 1413). She can do her own laundry, but it is difficult and takes her a long time because of pain. (*Id.*). Her father does 90 percent of the housework, but she clears the table to help. (*Id.*). She was becoming unable to do dishes any longer because her hands will freeze up and get stuck in a cup; she had broken many cups recently. (*Id.*). She also had a small dog she cared for and would take him out to the front yard about two times in eight hours. (Tr. 1414).

Nichols described a typical day as follows:

> I get up probably about 9:00 – get up, go to the bathroom, take the dog out, make breakfast for me, make sure he's got everything he needs, lay down, elevate. And then I basically get up, make a small snack for myself and then elevate some more. And then I go and make lunch, take him out again, come back in, elevate. And I basically just elevate – I basically lay down and wait for my dad to get home from work.

(Tr. 1414-15). She does not do anything but rest when she lays down to elevate her legs; the arthritis in her hands and wrist is bad enough that she had to stop doing her arts and crafts about

14

four years prior to the hearing. (Tr. 1416-17). She does not go out for entertainment often, but if she does, she has to take her wheelchair. (Tr. 1415-16). She likes to take her electric wheelchair to Cedar Point so she can roll around and people-watch with her dad, her sister, and her sister's children. (*Id.*). She will rest and elevate her legs at Cedar Point by resting her feet on the back of the bench and laying on the bench seat. (Tr. 1420).

The VE then testified. (Tr. 1421). The ALJ presented the following hypothetical to the VE: an individual of Nichols's age, education and experience, who could perform light work, can frequently climb ramps and stairs, never climb ladders, ropes, and scaffolds, frequently kneel, crouch, and crawl; could never be exposed to hazards of unprotected heights, dangerous machinery, and commercial driving; limited to perform simple, routine tasks, but not at production-rate pace, and is also limited to occasional routine workplace changes. (Tr. 1423-24). The VE testified that such an individual could not perform Nichols's past work, but could perform work as a merchandise marker, DOT 209.587-034, SVP 2, 137,000 jobs in the national economy; routing clerk, DOT 222.687-022, SVP 2, 118,000 jobs in the national economy; and office helper, 239.587-010, SVP 2, 6,700 jobs in the national economy. (Tr. 1424).

The VE also testified in response to a hypothetical opposed by claimant's representative that if the individual needed to elevate their leg above heart level at any time during the workday it would be work-preclusive. (Tr. 1426-27). In the VE's opinion, the standard breaks of two 15-minute breaks and a 30-minute lunch would be permissible for an individual to rest and elevate their legs, but additional breaks to rest and elevate would likely be work-preclusive. (*Id.*).

## IV.    The ALJ's Decision

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since December 20, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: gouty arthritis, rheumatoid arthritis left foot, unspecified, arthralgia left ankle, sciatica, posterior tibial tendon dysfunction, obesity, unspecified depressive disorder, anxiety, and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently kneel, crouch, or crawl; never have exposure to hazards (unprotected heights/dangerous machinery/commercial driving); limited to performing simple, routine tasks, but not at a production rate pace; and limited to occasional routine workplace changes.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 4, 1983 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 20, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1361-89).

16

## V.    Law & Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.    if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also

17

supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012)

## VI.    Discussion

### A.    Plaintiff's Argument

One issue is before me for recommendation to the District Judge:

Whether the administrative law judge erred in her evaluation of pain and other symptoms where she overstated Ms. Nichols's activities and failed to build a logical bridge between the evidence and the ultimate conclusions concerning residual functional capacity?

(ECF Doc. 9, p. 1). Nichols raises error with the ALJ's evaluation of pain, particularly with respect to her severe impairments of gouty arthritis, rheumatoid arthritis left foot unspecified, arthralgia left ankle, and posterior tibial tendon dysfunction. (*Id.* at p. 18). Nichols contends that the ALJ's conclusion that her daily activities were inconsistent with testimony about her symptoms is incorrect and not supported by the evidence of record. (*Id.* at pp. 18-21). She argues that activities of daily living are relevant only where they document a claimant's ability to perform those activities on a sustained basis, which she cannot do. (*Id.* at p. 22, citing *Gayheart v. Comm'r of Soc. Sec.*, 710 F. 3d 365, 377-78 (6th Cir. 2013)). In Nichols's view, the ALJ did not appropriately articulate her reasoning according to the regulations, which requires remand. (ECF Doc. 9, pp. 22-23).

In contrast, the Commissioner reminds the Court that an ALJ's determination of subjective evidence – like Nichols' complaints of pain and reports of her activities of daily living – are afforded deference on review. (ECF Doc. 10, p. 20). The Commissioner argues that the ALJ provided an adequate explanation, supported by substantial evidence, and sufficient to guide the Court's review. (*Id.* at pp. 20-21). The Commissioner argues that the ALJ acknowledged Nichols' reported difficulties in performing her activities of daily living, but also considered evidence to the contrary, where she reported being able to complete activities without significant complaint. (*Id.* at p. 22). Moreover, as the Commissioner presents, the ALJ appropriately compared Nichols' subjective complaints against other objective evidence, including treatment notes and prior administrative medical findings. (*Id.* at pp. 23-24). The Commissioner argues that

19

Nichols' argument falls short of demonstrating that the ALJ's analysis was unsupported by substantial evidence and remand is unwarranted. (*Id.* at pp. 24-25).

Nichols may disagree with the ALJ's evaluation, but the Commissioner is correct when he writes that an ALJ's consideration of a claimant's subjective symptom statements receives great deference on review. It is for the ALJ, not the reviewing court, to judge the consistency of a claimant's statements against the record. *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). Where the ALJ cites legitimate, substantial evidence to support their factual conclusions, this Court may not second-guess. *Id.*, quoting *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012). A plaintiff's contrary conclusion about their own subjective complaints does not meet their burden to demonstrate remand is necessary. *Lipanye*, 802 F. App'x at 171. Nichols has pointed to many areas where she alleges she is more limited than the ALJ's assessment of her abilities. I am mindful of her stated inability to sustain her activities over the course of a day, but having reviewed the record and the ALJ's decision, there is also sufficient evidence otherwise which the ALJ considered in her determination. The ALJ's decision is therefore supported with substantial evidence and in accordance with the regulations.

When assessing a claimant's subjective statements, the regulations describe a two-part process: "the ALJ must first determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Grames v. Comm'r of Soc. Sec.*, 815 F. App'x 820, 825 (6th Cir. 2019) (internal quotations and marks omitted); *see also* SSR 16-3p, 2017 WL 5180304, *3 (Oct. 25, 2017). In so doing, the ALJ must determine whether there is objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment that could reasonably be expected to produce the alleged pain. 20 C.F.R. § 404.1529(c)(2).

If there is, the ALJ next considers all the evidence to determine the extent to which the pain affects the claimant's ability to work. *Heart v. Comm'r of Soc. Sec.,* 2022 WL 19334605, at *3 (6th Cir., Dec. 8, 2022); *see also* 20 C.F.R. § 404.1529(c)(3). With this, "the ALJ must consider the objective medical evidence and the claimant's reported daily activities, as well as several other factors, to evaluate the intensity, persistence, and functional limitations of the claimant's symptoms." *Grames*, 815 F. App'x at 825; *see also* 20 C.F.R. § 404.1529(c)(1)-(3) *and* SSR 16-3p, 2017 WL 5180304, at *4, *7-8 (Oct. 25, 2017).

Social Security Ruling 16-3p lists the factors relevant to the ALJ's determination of the persuasiveness of a claimant's statements about "the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers v. Comm'r*, 486 F.3d 234, 247 (6th Cir. 2007). These factors include: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain; and, "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2017 WL 5180304, at *7-8; *see, e.g.*, *Morrison v. Comm'r*, No. 16-1360, 2017 WL 4278378, at *4 (6th Cir. Jan. 30, 2017). An ALJ need not expressly address all the factors listed in SSR 16-3p, but they should sufficiently articulate the assessment of the evidence to assure the reviewing court that the ALJ considered all relevant evidence. *Cross v. Comm'r*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

SSR 16-3p also instructs an ALJ how to consider a claimant's statements about intensity, persistence, or functional limiting effects of their symptoms in relation to treatment sought for those symptoms.

> [I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

SSR 16-3p, at *9. "Attempts to obtain treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent." *Jill L. v. Comm'r of Soc. Sec.*, 2023 WL 4757601, at *7 (S.D. Ohio 2023), citing SSR 16-3p, at *9.

The review in this case must be deferential. A reviewing court "must affirm the ALJ's decision as long as it is supported by substantial evidence and is in accordance with applicable law." *Showalter v. Kijakazi,* 2023 WL 2523304, at *2 (6th Cir., Mar. 15, 2023).

Applying that deference in my review, I cannot determine that the ALJ committed reversible error. The ALJ applied the two-step process outlined in the regulations and in SSR 16-3p. First, the ALJ determined that Nichols had impairments including "malformation of left ankle, increased swelling of left ankle, vertigo, depression, inactive tuberculosis, asthma, difficulty walking, PCOS and learning disability since 3rd grade." (Tr. 1371). The ALJ then considered all of Nichols' own statements about her abilities, describing her testimony and other reports in detail. (Tr. 1371-73). The ALJ summarized some testimony as follows:

> The claimant reported issues standing for long periods due to left ankle swelling and pain; she walks slowly (8E/2); and she has issues with standing, walking, and

> climbing stairs (8E/7); she has some issues with self-care due to be unsteady on her feet; she uses a cane or ambulation (8E/3, 8); and she does not handle stress or changes in routine, well (8E/8). She did not note any mental functional limitations in the Function Report at Exhibit 8E. She also noted that she is able to prepare meals daily; she is able to complete chores such as cleaning and laundry (8E/4); she gets around 2-3 times per day; she is able to drive and ride in a car; she can go out alone; she is able to shop in stores for groceries, clothes, and petfood; she is able to pay bills, count change, and handle a savings account (8E/5); she spends time with others regularly (8E/6); she does not have issues getting along with family, friends, neighbors, or others; she can follow simple instructions (8E/7); and on days she does not work, she gets up at 9am, walks her dog, straightens the house, goes to medical appointments, and keeps her feet elevated (8E/9).

(Tr. 1371). The ALJ also considered the length of time Nichols is able to sustain some of these activities, and how long she needs to elevate and ice her leg. (*See* Tr. 1372, describing Nichols' hearing testimony that "the longest she has driven in the past year is 12 minutes" or that "it takes her 2 hours to do the dishes because she has to start and stop" or that "her driving is limited, she used a cane for short distances and an electric scooter for longer distances, she elevates and ices her legs 75% of the day."). Even so, the ALJ found that Nichols' medically determinable impairments could cause her the stated symptoms, but not at the intensity she alleged. (*Id.*).

In reaching the conclusion that Nichols' symptoms did not occur with such frequency, duration or severity as to reduce the claimant's residual functional capacity or to preclude all work activity on a continuing and regular basis, the ALJ considered factors including intermittent cane use (Tr. 1376), pain that "comes and goes" (*id.*), denial of any gait problems (Tr. 1376, 1377), good treatment results for her rheumatoid arthritis (Tr. 1377), and a completed questionnaire in which Nichols reported moderate issues when carrying out her daily activities but her health was otherwise "very good" (*id.*). After this review, the ALJ simply concluded: "This evidence supports physical functional limitations, but not to the extent alleged." (*Id.*).

Based on the ALJ's complete review, spanning several pages, I determine that the ALJ properly considered Nichols' subjective symptom statements in accordance with the regulations.

This Court may not overturn where the ALJ has made a determination supported with substantial evidence and articulated in a manner that the reviewing court can logically follow, which the ALJ has done here. Although the threshold for substantial evidence is "not high," *Biestek*, 587 U.S. at 102, the standard becomes even more deferential when the court reviews an ALJ's determinations of a claimant's subjective symptoms. *Walters*, 127 F.3d at 531. As such, even though Nichols presents evidence that she is more limited, I must defer to the ALJ's consideration of the evidence.

I therefore recommend that the District Court affirm as to Issue Two. The ALJ did not commit reversible error in her evaluation of Nichols' subjective symptom statements.

## VII.    Recommendation

Because the ALJ applied the correct legal standards and made a decision supported by substantial evidence, I recommend the Commissioner's final decision denying Nichols's applications for DIB and SSI be affirmed as to Issue Two.


Dated: August 11, 2025

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).